# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC., *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>DONALD C. WINTER, Secretary of the Navy, *et al.*,<br><br>Defendants. | 8:07-cv-00335-FMC-FMOx<br><br>**MODIFIED PRELIMINARY INJUNCTION** |

Pursuant to the Court's Order Issuing Modified Preliminary Injunction (docket no. 102) issued January 10, 2008, the Court hereby order the Navy to immediately implement the following mitigation measures:

1. <u>12 Nautical Mile Coastal Exclusion Zone</u>

The Navy shall maintain a 12 nautical mile exclusion zone from the California coastline at all times. The great weight of scientific evidence points to avoidance of marine mammal habitat as the most effective means of minimizing sonar-related injury to marine mammals. *E.g.*, Supplemental Decl. Robin William Baird ("Baird Supp'l Decl.") ¶¶ 5, 7-8; Supplemental Decl. Edward Parsons ("Parsons Supp'l Decl.") ¶ 10; T. Agardy, *et al.*, *A Global Scientific Workshop on Spacio-Temporal*

*Management of Noise*: *Report of the Scientific Workshop*, Pls.' Ex. 24. From the evidence presented to the Court in connection with the remand order, it appears to the Court that the exclusion of a 12 nautical mile zone adjacent to the coastline is both practicable and reasonably effective. The Navy adhered to a 25 nautical mile exclusion zone for its Rim of the Pacific (RIMPAC) exercises off the coast of Hawaii. Decl. Rear Admiral John M. Bird ¶ 46e (hereinafter "Bird Decl."). In addition, the Navy operated under a 2006 National Defense Exemption ("NDE I") that included a 12 nautical mile coastal exclusion zone. *Id.* Although the Court is cognizant of the high density of rich marine life within 25 nautical miles of the California coastline, it appears from the evidence before the Court that a coastal exclusion of that size would unduly hamper the Navy's training efforts. Accordingly, the Court deems the 12 nautical mile exclusion zone appropriate, in that the Navy has previously acknowledged its practicability and it would bar the use of MFA sonar in a significant portion of important marine mammal habitat.[1]

### 2. 2200 yard MFA Sonar Shutdown

The Navy shall cease use of MFA sonar (either vessel-based or aircraft-based sonobuoys or active dipping sonar) when marine mammals are spotted within 2200 yards (approximately 2000 meters). The Court is persuaded that the 1000 yard/500 yard/200 yard scheme proposed by the Navy is grossly inadequate to protect marine mammals from debilitating levels of sonar exposure. Bird Decl. ¶ 46f. A number of studies indicate that sonar injures marine mammals not only via acoustic harassment, but by panic-induced rapid diving or surfacing, which leads to decompression sickness (*i.e.*, "the bends"). *Compare* Bird Decl. ¶ 39 to Supplemental Decl. David E. Bain ¶

---

[1] The Court is likewise convinced that the 25 nautical mile exclusion zone proposed by Plaintiffs is impracticable, in that it would prevent the Navy from training to detect submarines in the very bathymetry in which submarines are likely to hide. Accordingly, the Court finds that the most practicable compromise is to allow the Navy to approach nearer to the shore, but to expand the range in which MFA sonar must be shut down to minimize the exposure of marine mammals.

7 (hereinafter "Bain Supp'l Decl."); Pls.' Supplemental Exs. 5, 6 (scientific articles detailing "acute embolic disease" and other bubble-induced sickness in marine mammals, caused by sound exposure); Parsons Decl. ¶ 5.  Indeed, scientists have observed flight responses by marine mammals during naval exercises at distances as great as 22 kilometers (in the case of killer whales) or even 40 kilometers (Dall's porpoises). Bain Supp'l Decl. ¶¶ 12-13.  The Court therefore is persuaded that while the 2200 yard shutdown requirement may protect marine mammals from the harshest of sonar-related consequences, it represents a minimal imposition of the Navy's training exercises.

This mitigation measure may be discontinued (as described in NDE II) where the marine mammals at issue are dolphins or porpoises, and it appears that the dolphins or porpoises are intentionally following the naval vessel in order to play in or ride the vessel's bow wave.

### 3. Monitoring

a. Pre-Exercise Monitoring: Each day in which MFA sonar is to be used, the Navy shall monitor for the presence of marine mammals for 60 minutes before employing MFA sonar.  If marine mammals are detected within 2200 yards, the Navy will wait until: (1) the marine mammals are seen to leave the vicinity, or (2) the MFA sonar-employing vessel has transited at least 2200 yards away from the marine mammals.

b. During Exercise Monitoring: The Navy will utilize two dedicated National Oceanic and Atmospheric Administration- and NMFS-trained lookouts at all times when MFA sonar is being used. *See* Parsons Supp'l Decl. ¶ 7 (describing dramatically greater mitigation measure compliance when specialist marine mammal observers are present, as compared with ships' crew members). To the maximum extent practicable, the Navy will employ passive acoustic monitoring to supplement the visual detection of the presence of marine mammals.  For example, in the San Clemente instrumented range (SCIRC), the Navy shall attempt to use its M3R acoustic monitoring system to

monitor the presence of marine mammals. As beaked whales are close to impossible to detect visually, the employment of passive acoustic monitoring, *e.g.* by hydrophones, is the best means of detection and real-time avoidance of beaked whales. Decl. Robin William Baird ¶¶ 6-7 (explaining that detection of beaked whales approaches 0 percent at distances of 1 kilometer or greater and that beaked whales regularly dive for 50-60 minutes before surfacing); Baird Supp'l Decl. ¶¶ 5-6. Accordingly, the Navy shall employ such passive acoustic monitoring before and during MFA sonar use in areas where beaked whales are more likely to be present. *See* Jefferson Decl. ¶ 12 (noting that beaked whales are likely to be present at depths between 1000 meters and 2000 meters around the continental slope); Pls.' Ex. 11 (scientific study indicating that the area off the California coast west to 125.0°W is a key area for beaked whale populations).

      c. Aerial Monitoring: The Court understands that the Navy deploys aircraft before and during its training exercises as part of its overall training scheme. Accordingly, the Court orders that the Navy shall use such aircraft to assist in the monitoring of the presence of marine mammals. Pre-exercise dedicated aerial monitoring shall be conducted within the 60 minutes before the start of use of MFA sonar. Aerial monitoring by naval aircraft participating in the exercises shall continue for the duration of exercises when MFA sonar is being used. Any spotting of marine mammals will be communicated to vessels employing MFA sonar with all possible speed, to allow for timely compliance with the safety zone requirement detailed above.

      4. Helicopter Dipping Sonar

      In addition to aerial monitoring described above, helicopters shall monitor for marine mammals for 10 minutes before deployment of active dipping sonar. If marine mammals are spotted within the 2200 yard safety zone, all use of active dipping sonar shall cease until the helicopter has transited at least 2200 yards away from the marine mammals, or the mammals are seen to exit the safety zone.

/ / /

### 5. Surface Ducting Conditions

Surface ducting, in which sound travels further than it otherwise would due to temperature differences in adjacent layers of water, are difficult to predict. Bird Decl. ¶ 52. In addition to making submarines difficult to detect, surface ducting causes the received decibel level of sound to be higher at greater distances than otherwise would be expected. *Id.* Although not predictable, when significant surface ducting conditions[2] are detected, the Navy shall power down sonar by 6 dB.

### 6. Choke Points and the Catalina Basin

The parties disagree as to whether the Catalina Basin between the Santa Catalina and San Clemente Islands constitutes a "choke point." The Navy insists that it is not a choke point because it is not "a strategic strait or canal." Defs.' Mem. Regarding Tailored Preliminary Injunction at 11; Bird Decl. ¶ 54. Plaintiffs argue that it is at least a "simulated choke point," and that the Navy previously has referred to the area as such. Pls.' Opening Brief Regarding Appropriate Mitigation Measures at 13 n.6; *e.g.,* Pls.' Ex. 4 at 93, 136, 204, 239 (Navy Overseas Environmental Assessments describing use of the area as a "simulated strait."). In any event, the Court is satisfied that ingress and egress to the Catalina Basin is restricted, and that the area includes a high density of marine mammals. Baird Supp'l Decl. ¶ 8. Accordingly, the Court orders the Navy to refrain from employing MFA sonar in the Catalina Basin. The Court notes that this requirement is not intended to restrict activities within the San Clemente Island Range Complex (SCIRC), so long as MFA sonar is not employed closer than 5 nautical miles from the western shore of San Clemente Island, as represented in Defendants' papers. Defs.' Mem. at 10-11; Bird Decl. ¶¶ 59, 62.

### 7. Continue NDE II Mitigation Measures

The Navy shall continue to employ the mitigation measures listed in NDE II.

---

[2]Defined in Defendants' papers as "a mixed layer of constant water temperature extending from the sea surface to 100 feet or more." Defs.' Mem. at 18.

1  To the extent that the requirements of this Order conflict with, or are stricter than, the
2  NDE II mitigation measures, this Order controls.
3
4
5  IT IS SO ORDERED.
6  Dated: January 10, 2007
7
8
9  _____
10  FLORENCE-MARIE COOPER, JUDGE
   UNITED STATES DISTRICT COURT